```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
```

**THE ESTATE OF ANDREA BRANNON,**

                              **Plaintiff,**

            -against-

**CITY OF NEW YORK, et al.,**

                              **Defendants.**
```
-----------------------------------------------------------------X
```

**14-CV-2849 (AJN)(SN)**

**REPORT AND RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE ALISON J. NATHAN:**

       This motion to enforce arises in a dispute between the estate of deceased *pro se* plaintiff Andrea Brannon and defendant John Doe police officers 1 through 20 (collectively, the "City" or the "defendants") over the enforceability of an email exchange between Brannon and the City alleged to constitute an agreement to settle Brannon's claims. For the following reasons, I find that the parties entered an enforceable settlement agreement and therefore recommend that the defendants' motion be GRANTED.

## BACKGROUND

**I.    Complaint Allegations**

       Brannon alleges that she was twice wrongfully detained by officers of the New York Police Department ("NYPD"). The first incident occurred on November 25, 2012, at 299 Meserole St. in Brooklyn, New York. Brannon was hired to "greet guests at a music event" (Compl. ¶ 12), which was a potentially illegal warehouse party. (See Transcript of December 17, 2014 Status Conference, ECF No. 42, at 6:19-24.) At around 1:00 a.m., a group of plainclothes officers approached her, identified themselves as NYPD officers, showed their badges,

"confiscated paperwork (primarily, names of invited guests)" in her possession (Compl. ¶ 14), and gathered Brannon and her coworkers "toward the back of a police van, where an officer paraded leg shackles in front of them, as if they were about to be restrained and placed into the van." (Id. ¶ 21.) Approximately forty-five minutes later, the NYPD officers allowed Brannon to leave without charging her. (Id. ¶ 22.) The officers never read Brannon or her coworkers their rights under Miranda v. Arizona, 384 U.S. 436 (1966). (Compl. ¶ 20.)

The second incident occurred on March 20, 2014, when Brannon was a patron of Lit Lounge, a bar in the East Village of Manhattan, New York. (Id. ¶ 24.) At or around 2:00 a.m., plainclothes officers entered the venue and surrounded Brannon and one other individual and immediately placed them in handcuffs without informing Brannon of her Miranda rights, led her outside to the street, and advised her that she was suspected of "dealing in narcotics." (Id. ¶ 27.) Brannon alleged that the NYPD officers searched her without her consent and released her after they determined that she did not possess any narcotics or contraband.

Brannon did not know the names of any of the officers involved in her detentions.

**II.     Procedural Background**

On April 22, 2014, Brannon filed her complaint *pro se* against the City of New York and John Doe Police Officers 1-20, alleging civil rights violations pursuant to 42 U.S.C. § 1983. ECF No. 1. The defendants moved to dismiss the City of New York, and Brannon consented to its dismissal. The City of New York was dismissed with prejudice by Order dated December 18, 2014.

The parties appeared before the Court for an initial status conference on December 17, 2014. At that time, Brannon indicated an interest in prompt resolution of her claims and stated that the parties had begun to discuss settlement. (See Tr. at 10:20-24.) By January 30, 2015, the

defendants filed a letter with the Court indicating that settlement negotiations were underway and that a settlement conference with the Court was not necessary.

## III.     Settlement Negotiations

On January 22, 2015, defendants' attorney Theresa D'Andrea sent an email (the "January 22 email") to Brannon proposing to settle both of Brannon's claims for a total of $1,500. The email read, in part:

> I am writing to follow-up with your demand for $3,000. Based on your demand, I am assuming that you are evaluating each incident at $1,500 (please correct me if I'm incorrect). After further review with my office, I am willing to ask for $1,500, to settle the second incident that occurred in March of 2014 (although I make no representation that I can actually obtain this amount of money at this time) . . . . Please advise on whether you are willing to accept $1,500, to settle your lawsuit against the City defendants, I will then put in the request with my supervisor.

D'Andrea Decl. Ex. A. at 2-3. It was the position of the defendants that Brannon's claim for the November 25, 2012 incident could be dismissed on summary judgment.

On January 27, 2015, Brannon replied, indicating that she would settle both her claims for $1,850. That email (the "January 27 email") reads, in relevant part, as follows:

> I disagree that the city would win on a motion for summary judgment for the 2012 incident, as greeting guests would not give rise to reasonable suspicion that I, personally, was violating [the New York State Alcoholic Beverage Control Law]. Suspicion that criminal activity is nearby is not justification to detain everyone in the area absent individualized suspicion. But, in the interest of settling this mater immediately, I would agree to dismiss both counts for $1,500 *plus* my filing fee of $350, for a total of $1,850. This is the lowest offer I am willing to accept at this time, and will need to proceed toward discovery otherwise. Please let me know your supervisor's thoughts.

Ex. A at 2.

3

On February 3, 2015, D'Andrea wrote back (the "first February 3 email") that "[d]efendants offer $1,850, inclusive of costs and fees, to settle all of plaintiff's claims to date. I will write to the Court to let it know this case has settled – and I will mail you the settlement paperwork." Ex. A at 1. Brannon replied that same day (the "second February 3 email") to say simply, "Thank you. I will keep an eye out for the documents." Id.

### IV. Death of Brannon and Substitution of Plaintiff

On March 5, 2015, pursuant to Federal Rule of Civil Procedure 25, the defense filed a Suggestion of Death, indicating that Brannon died on February 7, 2015, and requesting 90 days for a proper party to file a motion for substitution. ECF No. 29. On April 30, 2015, Jonathan Corbett, Brannon's boyfriend before her death and now the administrator of her estate, filed a motion to substitute himself *pro se* as the plaintiff in this case, indicating that the Surrogate Court of New York County appointed him as estate administrator on March 11, 2015. ECF No. 32. In his petition for letters of administration, Corbett wrote "Andrea was Plaintiff in Brannon v. City of New York, 14-CV-2849 (USDC SDNY). The parties had informally negotiated a settlement of $1,850 to be paid to Andrea. Administrator will seek to formalize settlement." D'Andrea Decl. Ex. C at 2. In granting his petition, the Surrogate's Court set the following limitations: "These letters authorize the collection only of a total of $8,000.00 dollars. Any collection above the amount must be authorized by further order of the Surrogate. These letters with respect to the cause of action are limited to the power to prosecute and confer no power to compromise the action, collect any settlement or enforce any judgment until further order of this court, or the order of any court of competent jurisdiction (EPTL 5-4.6)." D'Andrea Decl. Ex. B.

After a conference on May 14, 2015, I granted Corbett's motion for substitution. ECF No. 38. The parties then appeared before me telephonically on May 29, 2015 regarding this

4

motion, and I set a briefing schedule that was memorialized in an order later that day. ECF No. 39.

## DISCUSSION

The question before the Court is whether the email exchange constitutes a binding agreement for the purposes of settlement. In the alternative, the City defendants argue that Corbett should be estopped from denying the settlement based on his appointment as executor of Brannon's estate. For the reasons stated below, I find that the emails constitute a binding agreement, and so the Court need not reach the estoppel issue.

### I.     The Role of the Administrator

Corbett, as the administrator of Brannon's estate, has stepped into the role of plaintiff in continuance with Brannon's prior actions and, in that role, he is bound by them. McKnight v. Craig's Adm'r, 10 U.S. 183, 187 (1810) (as later codified in Rule 25(a), "defendant . . . can only plead what the intestate could have pleaded; and that it is not to be considered as a proceeding against the representative of the deceased, but a continuance of the original action."); Ransom v. Brennan, 437 F.2d 513, 516 (5th Cir. 1971) (Under Rule 25(a)(1), "[a] substituted party steps into the same position of the original party."); Summers v. Weiderhold, 96 Civ. 1291 (RSP)(GJD), 1998 WL 160830, at *3 n.1 (N.D.N.Y. Apr. 3, 1998) (same). Thus, Corbett's arguments are those of the original plaintiff claiming she did not intend to be bound absent a signed written agreement, or that she did not agree to settle her claims.

### II.    Enforceability of Settlement Agreements

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." Mtgs & Exp'tns Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974) (internal citations omitted). A settlement agreement is a "contract that is

interpreted according to general principles of contract law." Omega Eng'g, 432 F.3d at 443. Once a court finds that parties reached a settlement agreement, the prevailing view is that such agreement is binding on all parties, "even if a party has a change of heart between the time of the agreement . . . and the time it is reduced to writing." Elliot v. City of New York, 11 Civ. 7291 (RWS), 2012 WL 3854892, at *2 (S.D.N.Y. Sept. 5, 2012); accord U.S. v. Bank of New York, 14 F.3d 756, 759 (2d Cir. 1994) ("When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect." (citing Ackermann v. U.S, 340 U.S. 193, 198 (1950) (litigants cannot be relieved of the consequences of their strategic decisions merely because hindsight indicates that a decision was wrong))); Omega Eng'g, 432 F.3d at 445 ("It is an elementary principle of contract law that a party's subsequent change of heart will not unmake a bargain already made."); U.S. Fire Ins. Co. v. Pierson & Smith, Inc., 06 Civ. 0382 (CM)(LMS), 2007 WL 4403545, at *3 (S.D.N.Y. Dec. 17, 2007) (where a party has entered into an agreement to settle, "the party cannot avoid the settlement by refusing to sign the papers that would memorialize the terms of the agreement that were reported to the court"); Foster v. City of New York, 96 Civ. 9271 (PKL), 2000 WL 145927 at *4 (S.D.N.Y. Feb. 7, 2000) ("This Court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart."); Rivera v. State, 496 N.Y.S.2d 230, 231 (1985) (1st Dep't 1985) (refusing to vacate a settlement because the court found "nothing but afterthought and change of mind" (citations omitted)).

A presumption in favor of enforcement reflects the value that courts place on negotiated settlement agreements. Willgerodt v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997), aff'd sub nom. Majority Peoples' Fund for 21st Century, Inc. v. Hohri, 159 F.3d 1347 (2d Cir. 1998) ("Settlement agreements are strongly favored in New York and may not be lightly cast aside.");

6

Hallock v. State, 64 N.Y.2d 224, 230 (1984). It is also consistent with basic contract principles, which maintain that reformation of a settlement agreement is an extraordinary remedy. 27 Richard A. Lord, Williston on Contracts § 70:33 (4th ed. 2012) (reformation is appropriate only to correct a material, mutual mistake); Beecher v. Able, 441 F. Supp. 426, 429-30 (S.D.N.Y. 1977), aff'd, 575 F.2d 1010 (2d Cir. 1978).

    Mutual assent of the parties to the terms of a settlement is the essential component of a settlement agreement. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) ("Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance." (citing Maffea v. Ippolito, 668 N.Y.S.2d 653, 654 (2d Dep't 1998)). While a written document is the most traditional evidence of mutual assent, parties may enter and be bound by an agreement without signing a fully executed contract. Winston v. Mediafare Entm't Corp., 777 F.2d 78 (2d Cir. 1986); Bonnette v. Long Island Coll. Hosp., 3 N.Y.3d 281 (2004) (recognizing that the court may enforce a settlement agreement that is not reduced to writing). "Preliminary agreements" that address all negotiated terms are enforceable, even if they are oral, Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997), or written in an email, Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, 04 Civ. 1621 (KMW)(AJP), 2005 WL 1377853 (S.D.N.Y. June 9, 2005), and even if they contemplate a subsequent memorialization in an executed document, Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987).

    Where there is no final document on which to rely, the controlling factor in determining whether parties are bound by an agreement is whether a court has evidence of the parties' intent to be bound. Powell v. Omnicom, 497 F.3d 124, 129 (2d Cir. 2007); Winston, 777 F.2d at 80. Because a court cannot decipher the "secret or subjective intent" of the parties, "it is the

7

objective intent . . . that controls." Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997); accord 22 N.Y. Jur. 2d, Contracts § 29 (2013) ("In the formation of a contract, only the overt acts of the parties may be considered in determining mutual assent.")).

This Circuit has not resolved the question of whether a district court should apply federal or state law to decide a motion to enforce a settlement, where the jurisdiction of the district court rests on a federal question, as it does here. See, e.g., Powell, 497 F.3d at 129 n.1; Ciaramella, 131 F.3d at 322 n.1. In Ciaramella, however, the Court of Appeals noted that there was "no material difference" between New York law and federal common law on this issue. See Ciaramella, 131 F.3d at 322. See also Figueroa v. New York City Dep't of Sanitation, 475 F. App'x 365, 366 (2d Cir. Apr. 12, 2012) (recognizing that "the question of whether federal or state law controls the enforceability of a settlement agreement in this context is an open one" and declining to decide that question). The majority of district courts have applied only federal common law in federal question cases when a motion is filed to enforce an oral settlement agreement. See, e.g., Pierre v. Chase Inv. Servs Corp., 10 Civ. 1740 (SAS), 2013 WL 709055 (S.D.N.Y. Feb. 25, 2013), reconsideration denied, 2013 WL 1287330 (S.D.N.Y. Mar. 28, 2013); Alvarez v. City of New York, 146 F. Supp. 2d 327, 335 n.6 (S.D.N.Y. 2001). Because the Court of Appeals has not definitively ruled on the issue, this report will examine both sources.

A. **Federal Common Law**

The Court of Appeals for the Second Circuit has adopted a four-factor test to evaluate disputes around parties' settlement intentions in the absence of a formalized writing. Courts consider whether: (1) there has been an express reservation of the right not to be bound in the absence of a writing; (2) there has been partial performance of the contract; (3) all of the terms of the alleged contract have been agreed upon; and (4) the agreement at issue is the type of contract

that is usually committed to writing." Winston, 777 F.2d at 80. The factors "may be shown by oral testimony or by correspondence or other preliminary or partially complete writings." Id. at 81 (internal quotation omitted). No single factor is dispositive, Ciaramella, 131 F.3d at 323, but "[t]he first factor, the language of agreement, is the most important." Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989).

### 1. Express reservation

This factor most strongly favors enforcement of the settlement agreement. There is no evidence of an express reservation of the right not to be bound until the parties signed a written document memorializing their emailed settlement agreement. The issue is not mentioned in the email exchange and was not a condition of the agreement. Rather, the emails demonstrate defendants' offer in the January 22 email for $1,500, the plaintiffs' responsive demand in the January 27 email for $1,850, and the defendants' acceptance of that demand in the first February 3 email. In the second February 3 email, Brannon could easily have written that she did not want to settle or that she expressed the right not to be bound, but she did not.[1] Though she was *pro se*, Brannon's writing and actions amply demonstrated that she was a competent, sophisticated plaintiff. (See Tr. at 11:4-12 ("[THE COURT:] Ms. Brannon, you seem like you're sufficiently sophisticated that, notwithstanding being *pro se*, I feel like you can probably participate in this like I ask the lawyers to do . . . .").)

---

[1] Though the Court need not reach this issue, Brannon's statement of "[t]hank you" in the second February 3 e-mail arguably also functioned as her (unnecessary) acceptance of the City's offer (an offer which met her prior demand). See Republic Bank, Inc. v. W. Penn Allegheny Health Sys., Inc., 475 F. App'x 692, 699-700 (10th Cir. 2012) ("In determining the reasonableness of the manner and medium of acceptance, it is particularly probative whether the accepting party 'accepted in the same manner and medium and during the same conversation in which [the] offer[ ] w[as] made.' Textron, Inc. v. Froelich, 223 Pa. Super. 506, 302 A.2d 426, 427 (1973). The accepting party need not use magic words. See, e.g., id. (finding that the words "Fine, Thank you" indicated acceptance).").

9

The fact that the exchange occurred by email does not weaken the enforceability of the agreement. Indeed, if anything, the fact that the exchange was written strengthens its power to bind. See Hostcentric, 2005 WL 1377853, at *7 ("The [] emails constitute a classic offer and acceptance, contain all the terms of the agreement, and evidence the intent that the matter was now conclusively settled." (citation and internal quotation marks omitted)).

Similarly, the City's intention to memorialize the agreement in writing does not vitiate the binding power of the e-mail exchange. Teachers Ins., 670 F. Supp. at 497-98 ("Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, *despite a need for further documentation* or further negotiation." (emphasis supplied)). Although the parties contemplated that the terms of their agreement would be reduced to writing – D'Andrea stated in the first February 3 email, "I will mail you the settlement paperwork" – that alone does not preclude enforcement under the agreement. Shape CD, Ltd. v. Quiksilver, Inc., 07 Civ. 2033 (PKC), 2008 WL 2009668, at *2 (S.D.N.Y. May 6, 2008) ("The absence of a fully executed settlement agreement need not be fatal to enforcement, even if one were originally contemplated by the parties." (citing Winston, 777 F.2d 78)). And though Corbett is accurate in stating that there were fewer, and less detailed, emails in this case than in Hostcentric, that does not preclude enforcement either, because the emails here nonetheless established the requisite elements of a binding agreement. "While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be 'pedantic or meticulous' in interpreting contract expressions." Express Indus. & Terminal Corp. v. New York State Dep't of Transp., 93 N.Y.2d 584, 590 (1999) (quoting Cobble

10

Hill Nursing Home v Henry & Warren Corp., 74 N.Y.2d 475, 483 (1989)). Accordingly, the first Winston factor weighs strongly in favor of enforcement.

### 2. Partial performance

Actions (or the lack thereof) taken after the February 3 emails suggest little about whether the parties understood that the case was settled. It appears that no discovery was conducted and that the litigation was suspended. Defense counsel did not notify the Court of the settlement, and Brannon's death four days after the exchange prevented things from moving forward before Corbett's substitution. Arguably, Corbett's petition for letters of administration, sought in order "to formalize settlement," could constitute performance toward settlement. Accordingly, this factor either ways lightly in favor of enforcement, or is neutral.

### 3. Remaining material terms to negotiate

The third Winston factor examines whether all of the terms of the alleged contract were agreed upon. This factor strongly favors enforcement.

In the first February 3 email, the City accepted the terms of Brannon's January 27 email, namely the amount of money to be paid and the dismissal of both claims. No material terms were excluded from or added to the email. In claims under § 1983, money damages are standard. Because the City uses a common waiver form for all settlements, the only material issues in the negotiations were the amount to be paid ($1,850) and which claims were being resolved (both). The email exchange addressed both of those issues.

In his opposition, Corbett posits that there are hypothetical material terms that were not addressed. This straw man argument fails. Many of the alleged outstanding terms were in fact agreed to. From the text of the emails, it is clear that the parties contemplated that the City would pay Brannon's $350 filing fee but no other costs or fees; that Brannon would not pay the City

any money; and that, with the City already dismissed with prejudice, she would release the John Doe officer defendants for all claims arising from the two incidents raised in her complaint. Corbett has put forth no evidence that Brannon had other claims pending or in mind at the time of the settlement, and the mere specter of other possible claims that might arise after her death is insufficient to render material the extent of the waiver as to other claims. The specific timing of the exchange of documents and funds, meanwhile, is not a material term for the purposes of this factor without any evidence that either party considered it to be so. Finally, Corbett asks whether a non-disclosure agreement would be required, but this issue had never surfaced before and, as a municipality, the City cannot insist on confidentiality.

In short, there is no evidence that, as of February 3, 2015, any material term remained to be negotiated. Hostcentric, 2005 WL 1377853, at *8 (holding that emails between counsel stating all material terms of an agreement and an acceptance of them constituted a binding contract, despite the subsequent breakdown of negotiations). Brannon also did not object to the City's intent to communicate to the Court that a settlement had been reached. Though the Court did not receive such an email, Brannon's conduct is notable as an objective indication that she believed the case to be settled. Cf. Jackson, 2012 WL 1986593, at *3 ("[M]ost significantly, [the parties] communicated the settlement to the Court."). This further supports the conclusion that there were no terms left to negotiate as of February 3, 2015.

### 4. Usual form of agreement

The fourth Winston factor considers "whether the agreement at issue is the type of contract that is usually committed to writing." 777 F.2d at 80. This factor weighs in favor of enforcement.

The agreement here does not approach the length or complexity of those frequently considered to require a writing. See, e.g., Ciaramella, 131 F.3d at 326 (finding that an eleven-page settlement agreement that included terms that would apply in perpetuity required a writing); Winston, 777 F.2d at 83 (finding that a four-page agreement for $62,500 with a payment plan spanning years was sufficiently complex to require a writing); Walker v. City of New York, 2006 U.S. Dist. LEXIS 34345 (E.D.N.Y. Apr. 4, 2006) ("The settlement agreement in this case was for one lump-sum of $ 7,500.00. There was nothing complex about this agreement. Plaintiff has failed to provide any evidence that this facially straight-forward lump-sum settlement had any underlying complexity."). There was no discussion of a payment plan and the proposed settlement regards a relatively small sum of money that would not necessitate a payment plan for a large entity such as the City. Thus, although most settlement agreements in this Court are written, there is nothing complicated about this agreement that would require strict adherence to that tradition.

Even if the Court were to find that a settlement agreement of this nature is normally reduced to writing, several considerations justify the Court's confidence in the parties' intent to be bound by the emailed agreement. The email exchange shows that the parties actively negotiated the settlement amount; each side rejected an offer from the other before agreeing on a sum of $1,850. There is also no need to rely on oral representations. See Hostcentric, 2005 WL 1377853, at *10 ("[T]he Court notes that even if one were to find that this type of agreement should be in writing, it was – the parties were not dealing with an oral agreement but one written in an email from [defendant] and accepted by an email from [plaintiff]."). Thus, although settlement agreements are generally reduced to writing, several considerations favor a finding that the settlement of this case need not have been so memorialized in another fashion.

In sum, the first and third Winston factors strongly favor enforcement; the fourth factor also favors enforcement, though less forcefully; and the second factor is neutral. Based on this, I find that the first February 3 email confirmed the City's acceptance of Brannon's demand, and that this constitutes a binding agreement under federal common law.

**B.     New York Law**

Should the Court apply New York law, it should also find that the email exchange fulfills the writing requirement of New York Civil Practice Law and Rules ("CPLR") 2104. This provision states:

> An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.

To begin with, the New York Court of Appeals has left open the possibility that a court may enforce a settlement agreement that does not comply with the writing requirements of Rule 2104. See Bonnette, 3 N.Y.3d at 285 ("If there are rare occasions when [certain] doctrines can permit enforcement of a settlement agreement where the literal terms of CPLR 2104 are not satisfied (a question which we do not decide), this is not one of them."). See also Winston, 777 F.2d at 80 ("Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document."). Given the facts of this case – namely the written acceptance of settlement terms – this case may well fall within the narrow category of cases where the writing requirement of Rule 2104 may be overlooked. Cf. Figueroa, 475 F. App'x at 367 (concluding that the case is "one of those rare occasions" where Rule 2104 permits enforcement of the settlement agreement despite the absence of a writing).

But even if the Court were to enforce the writing requirement, some New York courts have found that an email from counsel satisfies Rule 2104. See Williamson v. Delsener, 874

14

N.Y.S.2d 41 (1st Dep't 2009) ("[T]he e-mails exchanged between counsel, which contained their printed names at the end, constitute signed writings (CPLR 2104) within the meaning of the statute of frauds . . . and entitle plaintiff to judgment."); Regolodo v. Neighborhood P'ship Housing Dev. Fund Co., Inc., 906 N.Y.S.2d 775, 2009 WL 3930902, at *3 (N.Y. Sup. Ct. 2009) (party is estopped from denying settlement agreement confirmed by attorney email based on "the technicality that literal compliance was not had with CPLR § 2104.").

Here, the February 3 emails demonstrated an agreement to the terms demanded in Brannon's January 27 email, which reflected all material terms of the settlement. Brannon's printed signature appears on the January 27 email, and D'Andrea's appears on the first February 3 email. Accordingly, the emails satisfy the requirements of Rule 2104. See Jackson, 2012 WL 198659, at *4 (plaintiff's counsel's email to defense counsel that described the material terms of the agreement and included his name at the end satisfied CPLR 2104); accord Morrison v. Bethlehem, 429 N.Y.S.2d 123 (4th Dep't 1980) (finding that letters acknowledging a settlement and signed by plaintiff's attorney satisfied the requirement of a subscribed writing for the purposes of CPLR 2104). Thus, even under New York law, the settlement agreement should be enforced.

**III.    Estoppel**

Because the email exchange is an enforceable settlement agreement under both federal common law and New York State law, the Court need not reach the issue of whether Corbett should be estopped from objecting to the settlement based on his representation to the Surrogate that he sought letters of administration because the "parties had informally negotiated a settlement of $1,850," and that he sought appointment "to formalize settlement."

15

## CONCLUSION

For these reasons, I find that the settlement agreement reflected in the email exchange is enforceable and recommend that the City's motion to enforce be GRANTED.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:  New York, New York
October 19, 2015

\* \* \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Alison J. Nathan at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Nathan. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).